UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FRANCOEUR, et. al.,
    *Plaintiffs*,
v.
D.L., et. al.,
    *Defendants*.

Civil No. 3:15cv953 (JBA)

September 25, 2017

**RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiffs A.F., PPA J.F. and J.F. filed a Twenty Count Amended Complaint [Doc. # 33] on October 2, 2015 alleging against minor defendant D.L and his mother J.L. assault (Count One), negligence (Count Two), and parental liability (Counts Three and Four), and alleging against Defendants Griswold Board of Education (the "Board") and Vice Principal Sarah Cary ("Ms. Cary"), negligence on the part of both (Counts Thirteen, Fourteen, Fifteen and Seventeen), negligent infliction of emotional distress on the part of Ms. Cary (Count Sixteen), and violations of Title IX (Counts Eighteen and Twenty) and of A.F's procedural rights (Count Nineteen) by the Board.[1] Defendants D.L and J.L now move [Doc. # 65] for summary judgment on all four state common law counts against them, while Defendants the Board and Ms. Cary move [Doc. # 66] for summary judgment on all counts against them. After briefing and oral argument, Plaintiff's only remaining federal claim is A.F.'s Title IX claim against the Defendant Board (Count Eighteen). For the following reasons, the Board's Motion for Summary Judgment on Count Eighteen is granted and the remaining state law claims are remanded to state court.

---

[1] Counts Five through Twelve were allegations against parties who have since been dismissed from this case. (*See* Order on Stipulation [Doc. # 58].)

## I. Background

This action arises out of an incident that occurred in the seventh grade lunch line on the second-to-last day of school at Griswold Middle School (the "School") on June 20, 2013. (*See* Pl.'s L. Civ. R. 56(a)2 Statement ("LR 56") [Doc. # 68-2] ¶ 1-2.) While A.F. was waiting in the long lunch line, she felt someone touch her buttocks. (*Id.* ¶ 2.) When she felt someone touch her again, and turned around, she saw three fellow students, N.Y., M.G., and D.L., behind her giggling. (*Id.* ¶ 4.) A.F. testified that although she told them to stop, the boys kept touching her butt, perhaps five or more times, until she saw M.G. go to the back of the line, which brought an end to the incident. (*Id.* ¶¶ 7-9.) A.F. never saw which of the three boys actually touched her. (*Id.* ¶ 10.) Two minor witness' statements indicate that they saw the boys "all touching A.F.'s butt on purpose." (Exs. E, F to Pl.'s Opp'n.)[2]

After lunch, A.F. and three of her friends went to the principal's office and informed Vice Principal Sarah Cary about being touched, at which point Ms. Cary had the students stop speaking and write their statements. (*Id.* ¶¶ 23-25.) Ms. Cary spoke with A.F. privately and had her show on her arm how she was touched; A.F. touched Ms. Cary's arm with an open hand. (LR 56 ¶¶ 26-27.) Ms. Cary pulled the three identified boys out of class to speak with them in the in-school suspension room. (*Id.* ¶ 28.) She verbally reprimanded them and had them write their statements, as well as apology letters. (*Id.* ¶ 29.) Ms. Cary also updated her principal about the incident, who

---

[2] A.F. testified that neither the friends with whom she was in the lunch line nor any adults in the lunch room observed the incident. (Ex. A (A.F. Deposition) to Def.'s Mot. for Summary Judgment at 35:8-10.) However, she then testified that when she went to inform the vice principal she brought three friends with her, two of whom had been in front of her in the lunch line and who, at Ms. Cary's request, wrote statements (*see* Exs. E, F to Pl.'s Opp'n) articulating what they had seen. (*Id.* at 39:21-42:14.)

in turn updated the superintendent. (*Id.* ¶ 32.) Ms. Cary was not aware of any prior disciplinary issues with the three boys. (LR 56 ¶ 34.) After ascertaining that A.F. was willing to accept M.G.'s apology, Ms. Cary brought him to apologize to A.F., which she accepted. (*Id.* ¶ 35.) The boys remained in the in-school suspension room, which is equivalent to detention, for the rest of that day (*id.* ¶ 28) and Ms. Cary gave D.L. and N.Y. lunch detention for the next day (*id.* ¶ 36).

Ms. Cary then called the parents of all the students involved, beginning with J.F., A.F.'s father. (*Id.* ¶ 37.) The next morning, J.F. came to the School and informed Ms. Cary that A.F. had told her mother about an incident approximately two months prior where, in science class, N.Y. had touched A.F.'s breast while ostensibly reaching across her for a pen. (LR 56 ¶¶ 38-40.) It is undisputed that no one at the School had ever been told about this earlier incident prior to that meeting. (*Id.* ¶ 41.) Upon learning of this possible prior incident, Ms. Cary assured J.F. that she would look into the allegations. (*Id.* ¶ 44.)

Ms. Cary informed the principal of this development, and contacted N.Y.'s mother, who met with Ms. Cary and denied any awareness of the prior incident, claiming she thought it was something her son would have told her about had it happened. (*Id.* ¶¶ 45-46.) When the boys came for lunch detention, Ms. Cary asked N.Y. directly about A.F.'s allegations, explaining the definition of harassment and that anything of a repetitive nature is of great concern. (*Id.* ¶¶ 47-48.) N.Y. denied the allegations about the prior incident and assured Ms. Cary he understood what she was saying and what her expectations for his behavior were. (*Id.* ¶ 49.)

Ms. Cary also spoke with the school psychologist about how they would support A.F. the following school year. (*Id.* ¶ 50.) On June 24, 2013, upon advice from her principal, Ms. Cary wrote J.F. a letter, which concluded, at the principal's direction, that "unfortunately, the incident occurred on the next-to-last day of school and our ability to follow through to the last detail was

3

compromised," although she considered the investigation completed. (*Id.* ¶ 51; Ex. B (Deposition of Ms. Cary) to Pl.'s Opp'n. at 36:1-4.) Plaintiffs note that she never interviewed any other adults supervising the lunch line besides Mrs. Mager, but Plaintiffs do not identify anyone else with probative knowledge about the incident. After speaking with all the involved students, Ms. Cary concluded this had been "incidental conduct" and not sexual harassment. (LR 56 ¶ 53.) She determined that the boys had bumped into A.F. "and then not been as responsive to stop their game as they should have been in the face of her discomfort." (*Id.* ¶ 54.) Several factors informed Ms. Cary's decision, including A.F.'s delay in reporting the incident until after lunch and the fact she was familiar with all the involved students. (*Id.* ¶ 55.)

However, J.F. believed that what had happened to his daughter was sexual assault. (*Id.* ¶ 58.) Although Ms. Cary explained her investigation to him and that the boys had apologized and been punished, he contacted the State Police, who informed him that they would contact him if something did happen because the School would report it. (*Id.* ¶ 59-61.) J.F submitted a letter to the School stating that he wanted his daughters to be transferred to Plainfield schools or another school system because the School presented a "hostile environment." (LR 56 ¶ 62-63.) Despite the fact that over the summer the Board attempted to establish a plan that would keep A.F. and the boys separated in the next year, J.F. wanted the boys removed from the School and would not otherwise permit his daughters to return.[3] (*Id.* ¶¶ 64- 65; Ex. C (J.F.'s Deposition) to Def.'s Mot.

---

[3] The students were assigned to different classes for the year; they were to have different bus routes; A.F. was provided with designated staff members to contact with any concerns and to receive support; a school counselor was available to meet with A.F. on an as-needed basis; and there were to be daily or as-needed check-ins with A.F. (*Id.* ¶ 72.) Additionally, Ms. Cary or another administrator was to monitor the effectiveness of the safety plan and consider interventions beyond the 2013-2014 school year. (*Id.* ¶ 73.) The boys were to meet with the School principal to

4

for Summary Judgment [Doc. # 66-5] at 48:7-11.) J.F. decided that A.F. and her sister would not return to Griswold schools. (*Id.* ¶ 66.)

In September 2013, the Board's new Title IX coordinator, Susan Rourke ("Ms. Rourke"), was first informed of the June 20, 2013 incident by the superintendent, who requested she conduct an investigation. (*Id.* ¶ 68.) Ms. Rourke's investigation consisted of reviewing Ms. Cary's investigation and interviewing J.F. and Ms. Cary. She requested an interview with A.F., but J.F. denied the request. (*Id.* ¶ 69.) Ms. Cary also reviewed all the witness statements taken by Ms. Cary. (*Id.* ¶ 70.) From this investigation, Ms. Rourke concluded that the boys' conduct had not created a hostile environment within the meaning of Title IX because it was not "continuous, consistent, or over the top." (LR 56 ¶ 76.) She also concluded that Ms. Cary's investigation was complete and there was nothing else Ms. Cary could have done. (*Id.* ¶ 77.)

## II. Discussion[4]

---

review expectations and additional consequences for future misconduct. (*Id.* ¶ 74.) Additionally, all students were to attend a school-wide program on bullying/sexual harassment. (*Id.* ¶ 75.)

[4] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

5

Plaintiffs do not contest the Board's Motion as to the Sixteenth, Nineteenth, and Twentieth Counts and thus these claims are dismissed. Additionally, Plaintiffs fail to respond at all to Defendant's Motion for Summary Judgment on Count Seventeen, which is therefore also dismissed. As a result, the sole remaining federal claim conferring subject matter jurisdiction is A.F.'s Title IX claim against the Board, which is discussed below.

### A. A.F.'s Title IX Claim Against the Board

In Count Eighteen, Plaintiffs allege that the Board "tolerated and encouraged a pattern of sexual misconduct and gender discrimination against . . . A.F." resulting in a denial of education on the basis of her sex in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688. (Am. Compl., Count XVIII ¶ 20.) Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). In certain circumstances, deliberate indifference to known acts of student-on-student harassment may amount to a violation of Title IX capable of supporting a private damages action. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643 (1999). However, "funding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650.[5]

---

[5] There is no dispute as to the actual knowledge prong. The parties agree that the Board was notified of the June 20, 2013 lunch incident the same day it occurred. (LR 56 ¶¶ 23-25.) The parties also agree that the Board did not have notice of any alleged prior incident that may have occurred in A.F.'s science class. (*Id.* ¶ 41.)

6

### i. Deliberate Indifference

A school may be found to have acted with deliberate indifference both "when the defendant's response to known discrimination is clearly unreasonable in light of the known circumstances and when remedial action only follows after a lengthy and unjustified delay." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 751 (2d Cir. 2003) (internal quotation marks and citations omitted). "[T]he deliberate indifference must, at a minimum, cause [students] to undergo harassment or make them liable or vulnerable to it." *Davis*, 526 U.S. at 645 (alteration in original) (internal quotations marks omitted). In essence, "the measures taken [by the School] must be so inadequate that a degree of discriminatory intent may be inferred." *Carabello v. New York City Dep't of Educ.*, 928 F. Supp. 2d 627, 641 (E.D.N.Y. 2013) (quoting *Yap v. Oceanside Union Free Sch. Dist.*, 303 F. Supp. 2d 284, 295 (E.D.N.Y. 2004)). Although funding recipients may be liable for their deliberate indifference, this "does not mean that [they] can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." *Davis*, 526 U.S. at 648. Moreover, the Supreme Court recognized that in appropriate cases courts may determine on a motion for summary judgment that a school's response was not "clearly unreasonable" as a matter of law. *Id.* at 649. Defendants argue this is such a case.

Plaintiffs claim that the Board was deliberately indifferent because of the delay in waiting until the following school year to begin the Title IX investigation, which they argue was contrary to the Board's own procedures.[6] (Pl.'s Opp'n at 14.) The School's policy states that a complaint

---

[6] The total delay was 83 days and Plaintiffs argue there was no legitimate reason put forth by Defendant for this delay because school administrators work during the summer.

7

"must be made orally or in writing to the appropriate [Title IX] coordinator" and then a panel must convene "within fifteen school days from the receipt of the complaint." (Ex. F (School's Handbook Excerpt) [Doc. # 68-6] to Pl.'s Opp'n § 5145.5(a).) This policy appears to require the panel be convened only once the appropriate Title IX coordinator (here, Ms. Rourke) was informed, which did not occur until the following school year.[7] Furthermore, several courts have held that a school is "not required to proceed in any particular manner, even if . . . there was a school district policy in place that required the initiation of a formal investigation." *KF ex rel*, 2013 WL 177911, at *7; *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 292 (1998) (finding the "failure to promulgate a grievance procedure [did] not itself constitute discrimination under Title IX," and stating that a failure to abide by any such administrative requirements that may be in place cannot alone give rise to liability); *Oden v. Northern Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006) (nine-month delay in convening a hearing in contravention of College policy requiring a hearing within thirty days of formal complaint of harassment did not amount to deliberate indifference).

Thus, regardless of the Board's policies, whether, or when, an official Title IX investigation was conducted is not determinative of whether the School acted with deliberate indifference—instead the focus is on whether the School "respond[ed] to [the] Title IX violation in a manner that was . . . clearly unreasonable." *See KF ex rel. CF v. Monroe Woodbury Cent. Sch.*

---

[7] Although Ms. Rourke's safety plan included reviewing Section 5145.5 to remind administrators "that when a parent makes a report that a student has been subject to sexual harassment . . . the Title IX Coordinator shall be notified of the parent complaint," this was not the policy at the time of the incident. (Ex. F to Def.'s Mot. for Summary Judgment ¶ j.) There is no indication in the record that a panel was ever convened, but rather Ms. Rourke appears to have completed the investigation herself.

*Dist.*, No. 12 CIV. 2200 ER, 2013 WL 177911, at *7 (S.D.N.Y. Jan. 16, 2013), *aff'd*, 531 F. App'x 132 (2d Cir. 2013) (citing *Davis*, 526 U.S. at 648).

For instance, courts have held a reasonable jury could find a school deliberately indifferent where there was a four to six month delay before the school removed the convicted sexual assailant and harasser from the victim's class. *See Doe ex rel. Doe v. Coventry Bd. of Educ.*, 630 F. Supp. 2d 226, 235 (D. Conn. 2009). They have also found deliberate indifference where the school authorities either delayed unreasonably in taking action, or took no action at all. *See Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 90 (2d Cir. 2011) (A reasonable jury could find deliberate indifference from the Dean's deposition testimony that he "kept . . . quiet about the plaintiff's complaint . . . because he didn't want to let it out" and "did nothing to investigate [the] complaint."); *Kracunas v. Iona Coll.*, 119 F.3d 80, 90 (2d Cir. 1997) *abrogated in part on other grounds by Gebser*, 524 U.S. at 290–91 (1998) (finding "the district court erred in concluding that [the school's] response to the harassment—coming four to six months after [the] Dean . . . first learned of the allegations—was [not deliberately indifferent] as a matter of law"); *Doe v. E. Haven Bd. of Educ.*, 200 F. App'x 46, 49 (2d Cir. 2006) ("[A] reasonable fact-finder could conclude that East Haven school authorities acted in a clearly unreasonable fashion, where the alleged victim of a rape complained of verbal harassment based on her sex and related to the rape for five weeks before authorities took concrete action to get the perpetrators of the harassment to stop.").

By contrast, here the evidence shows that the School took immediate remedial action—Ms. Cary began an investigation as soon as she learned of the incident; she spoke with everyone involved, disciplined the three boys, notified their parents, and made sure over the summer that a plan was put into place to ensure A.F.'s safety during the next school year, including separation

from the boys.[8] (LR 56 ¶¶ 28-29, 36, 37, 64-65, 71-74.) She updated her principal throughout the investigation, who kept the superintendent informed. (*Id.* ¶¶ 32, 45.) She did not report anything to the Title IX coordinator or to any other authority because she did not think the behavior at issue required her to do so. (*Id.* ¶ 57.)

Although J. F. was dissatisfied with the Board's conclusion and response, the Board was under no obligation to expel the three boys, nor was it under any obligation to relocate the boys. *See Davis*, 526 U.S. at 648 (disagreeing with contention that "a school district must immediately suspend or expel a student accused of sexual harassment" and finding "victims of peer harassment [do not] have a Title IX right to make particular remedial demands"). Furthermore, while Ms. Cary never interviewed A.F.'s mother, whom A.F. had told of the earlier incident involving N.Y., Ms. Cary did not ignore this additional information once it was reported to her. She spoke with N.Y.'s mother, N.Y. himself, and attempted to speak with A.F. but was prevented from doing so. Additionally, while Ms. Cary did not immediately notify the Title IX coordinator when A.F. informed her of the incident in the lunch line, this alone is not sufficient to trigger liability for the school under Title IX, and even taken in conjunction with the relatively mild punishment meted out to the boys, no reasonable fact finder could find that the School's response "cause[d] [A.F.] to undergo harassment or ma[de her] liable or vulnerable to it." *Davis*, 526 U.S. at 645 (internal quotation marks omitted).

---

[8] Both J.F. and A.F. expressed that they did not trust the adults in the school in nearly verbatim terms, but provided no specific explanation for their mistrust. (*See* Ex. C (J.F.'s Deposition) to Def.'s Mot. for Summary Judgment at 44:24-25 ("I don't trust the adults in Griswold School."); (Ex. A (A.F.'s Deposition) to Pl.'s Opp'n at 98:1 ("I didn't trust the adults in the school.").) Their generalized sentiment, however, is not probative to determining whether the School's response could be found to have been deliberately indifferent.

In sum, "[t]here are no facts . . . show[ing] that [the Board's] response effectively caused the complained-of discrimination." *Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp. 2d 387, 398 (E.D.N.Y. 2005) (quoting *Davis,* 526 U.S. at 642–43). While there was clearly delay in involving the Title IX coordinator, the Board's response to address the conduct complained of was immediate and comprehensive and there is no evidence that the delay rendered A.F. liable to further harassment by the boys. Thus, the Board's response to A.F.'s complaint was not "clearly unreasonable" and Plaintiffs' Title IX claim must be dismissed.

### ii. Severity of Harassment

Furthermore, Plaintiffs' Title IX claim must also be dismissed because the conduct was not "so severe, pervasive, and objectively offensive that it can be said to [have] deprive[d] [A.F.] of access to the educational opportunities or benefits provided by the [S]chool." *See Davis*, 526 U.S. at 650. Generally, the complained of conduct must have a "systemic effect" in depriving the student's access to education, and while

> in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect, we think it unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment.

*Id.* at 652–53.

> In *Soriano ex rel. Garcia*, the district court found that the plaintiffs
>
> have not presented any facts that suggest the existence of a genuine issue requiring trial.... They have alleged two instances of sexual harassment by two different fourth-graders taking place nearly six months apart. Both involved discrete encounters, one involving a boy touching [the plaintiff's] vagina through her skirt, and the second involving a slap on her buttocks. These are strikingly offensive acts indeed, but plaintiffs have failed to demonstrate that they rise to the level of

11

pervasive harassment such that [the plaintiff] was deprived of "equal access to an institution's resources and opportunities."

*Soriano ex rel. Garcia v. Bd. of Educ. of City of N.Y.*, No. 01 CV 4961(JG), 2004 WL 2397610, at *6 (E.D.N.Y. Oct. 27, 2004) (citing *Davis*, 526 U.S. at 651).

On the other hand, *T.Z. v. City of New York* involved a one-time occurrence where the plaintiff suffered a serious sexual assault that qualifies as a class D felony under New York law. 634 F. Supp. 2d 263, 271 (E.D.N.Y. 2009). She was groped by one boy, who then held her down while another boy removed her clothing and touched her buttocks, while several other students watched. The court determined there was a question of fact as to whether the assault was pervasive and triggered Title IX liability, noting that "[t]he question of whether the assault on plaintiff was inevitable boy-girl [misconduct] that the Davis court stated would not rise to the level of Title IX harassment or whether it was serious enough to have a systemic effect on plaintiff's educational opportunities [was] one for the jury." *Id.* at 272 (internal quotation marks omitted).

The instant case involves conduct which, while undoubtedly embarrassing, degrading, and offensive to A.F., was a one-time occurrence and thus not pervasive.[9] No reasonable fact finder could find this conduct was "serious enough to have a systemic effect on plaintiff's educational opportunities." See *T.Z.*, 634 F. Supp. 2d at 272 (citing *Davis*, 526 U.S. at 653). The entire incident of being grabbed several times on her buttocks did not last very long. (*Id.* 12, 15.) A.F. stated that

---

[9] Plaintiffs allege as a disputed material fact that A.F. was subjected to further teasing and harassment by D.L. and N.Y. in the hallway shortly after A.F. left Ms. Cary's office. (Pl.'s LR 56 at 15, ¶ K.) However, A.F. testified only that the boys were sitting in the hallway "giggling and laughing, saying that they didn't get detention or that nothing happened to them." (Ex. A [Doc. #68-3] to Pl.'s Opp'n at 39:3-12.) Although this might be minimally relevant to the severity and pervasiveness of the conduct, the conduct as a whole still does not rise to the level of a Title IX violation as recognized in the cases cited above.

the boys "did it once, and they waited a few seconds. And then they did it again. And it was just the same thing, like, they waited a few seconds." (*Id.* ¶ 15.) The school officials promptly made clear to the boys responsible that their behavior was unacceptable and would not be tolerated, but the conduct was not sufficiently severe to implicate Plaintiff's Title IX rights.[10]

Because no reasonable fact finder could find this incident, under these circumstances, "so undermine[d] and detract[ed] from . . . [A.F.'s] educational experience, that . . . [she was] effectively denied equal access to . . . [the School's] resources and opportunities," Defendant is entitled to summary judgment on Plaintiffs' Title IX claim. *See Davis*, 526 U.S. at 651.

### B. The Remaining Claims Against Both Defendants Should be Remanded to State Court Under the Supplemental Jurisdiction Doctrine

The remaining claims are all state law claims.[11] Congress has made clear it is within a district court's discretion to refuse to hear supplemental claims after dismissal of all federal claims. *See* 28 U.S.C. § 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."). Indeed, the Second Circuit has instructed that in most cases where all federal claims have been dismissed before trial, "the balance of factors to be considered under the [supplemental] jurisdiction doctrine—judicial economy, convenience, fairness, and comity will point toward

---

[10] The previously undisclosed misconduct of N.Y. offers no support where it was unable to be explored with A.F. because J.F. declined for his daughter to be interviewed. Although Plaintiffs note that the science teacher in the class where this misconduct took place was never interviewed, they fail to offer any evidence of what such an interview would have revealed.

[11] The remaining claims are for assault (Count One), negligence (Count Two), and parental liability (Counts Three and Four) against D.L. and J.L., as well as negligence (Counts Thirteen, Fourteen and Fifteen) against the Board and Ms. Cary.

declining to exercise jurisdiction over the remaining state-law claims." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (quoting *Carnegie-Mellon Unix. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)); *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("[I]f the federal law claims are dismissed before trial . . . the state claims should be dismissed as well."). At oral argument the parties agreed if Count Eighteen were dismissed the remaining claims should be remanded. Therefore, the Court remands the remaining Counts against all four Defendants to state court.

### III. Conclusion

For the foregoing reasons, the Board's Motion for Summary Judgment on Count Eighteen is GRANTED. The remaining state law claims and related Summary Judgment Motions are REMANDED to the Connecticut Superior Court for the Judicial District of New London at New London.

IT IS SO ORDERED.

                              /s/
                              Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 25th day of September 2017.